******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ECKER, J., dissenting. The majority today adopts a novel construction of an important and long-standing statute, with severe consequences throughout Connecticut for innumerable municipal firefighters, police officers, and their survivors. General Statutes § 7-433c provides that every "uniformed member" of a municipal fire department and every "regular member" of a municipal police department hired before July 1, 1996, is entitled to receive an array of valuable disability and retirement benefits if they suffer any heath condition or impairment as a result of heart or hypertension disease.[1] These statutory benefits have existed since the early 1950s, and never once in the past seventy years has this court or, to my knowledge, anyone else suggested that the benefits were not available to *all* uniformed members of *any* municipal fire department and *all* regular members of *any* municipal police department who met the statutory criteria. Indeed, heart and hypertension benefits have been awarded to countless firefighters and police officers under § 7-433c, in contested and uncontested cases alike, without reference to the definition of "member" set forth in General Statutes § 7-425 (5).[2] Until today.

The majority now holds that § 7-433c heart and hypertension benefits are available only to those municipal firefighters and police officers who fit the narrow definition of "member" set forth in § 7-425 (5). In my view, the flaw in this conclusion is both unmistakable and decisive: if the majority is correct, then the very same definition of "member" would mean that heart and hypertension benefits are available *only* to those firefighters and police officers who receive pay from a municipality that chooses to participate in the Connecticut Municipal Employees Retirement System (CMERS), General Statutes § 7-425 et seq. The named defendant, the town of Waterford, Cohanzie Fire Department,[3] accepts this consequence as a natural result of applying § 7-425 (5) to § 7-433c and argues that "limiting benefits to those enrolled in [CMERS] is entirely proper." The majority is not so sanguine and resists the logic conceded by the defendant. The majority agrees that the legislature never intended to limit heart and hypertension benefits to CMERS members and even suggests that such an interpretation would be absurd. But the majority also concludes that it is not necessary to construe § 7-433c to limit these benefits to CMERS members because the sentence defining "member" in § 7-425 (5) can be split in half, the CMERS requirement can be excised, and only the second clause (the exclusion of employees who work less than twenty hours per week) would plainly and unambiguously apply to § 7-433c.

The majority's construction of the relevant statutes is unsound because, simply put, either the entire definition applies to § 7-433c or none of it does. Indeed, guided by General Statutes § 1-2z, I am left with little doubt regarding the correct outcome in this case. The statutes under consideration, far from being plain and unambiguous with respect to the applicability of the term "member" in § 7-425 (5) to "uniformed member" and "regular member" in § 7-433c, are quintessentially ambiguous on that precise question. On the one hand, § 7-425 states that, unless otherwise provided, its definitions apply to the part of the General Statutes in which § 7-433c is codified. On the other hand, virtually every sentence of text in the relevant statutes casts substantial doubt on the meaning that the majority deems obvious. The context provided by the broader statutory schemes adds to that doubt. In the final analysis, the language, legislative history, and remedial purpose of § 7-433c, and its relationship to the retirement system created by § 7-425 et seq. (i.e., CMERS), demonstrates that the definition of "member" does not apply to the terms "uniformed member" and "regular member" in § 7-433c. For that reason, I respectfully dissent.

I

A BRIEF OVERVIEW OF OUR CASE LAW
CONSTRUING § 7-433c

Before examining the language of the relevant statutes, it is useful to briefly review what this court previously has said about the heart and hypertension benefits scheme provided in § 7-433c. Since its enactment in 1951 and subsequent amendment in 1953, the statute now codified at § 7-433c has provided "special compensation to qualifying policemen and firemen who die or become disabled as a result of hypertension or heart disease." (Internal quotation marks omitted.) *Chambers* v. *Electric Boat Corp.*, 283 Conn. 840, 858 n.11, 930 A.2d 653 (2007). Our court repeatedly has observed that "[§] 7-433c was enacted 'for the purpose of placing [municipal firefighters and] policemen who die or are disabled as a result of hypertension or heart disease in the same position vis-à-vis compensation benefits as [municipal firefighters and] policemen who die or are disabled as a result of service related injuries.' " *Lambert* v. *Bridgeport*, 204 Conn. 563, 566–67, 529 A.2d 184 (1987), quoting *Pyne* v. *New Haven*, 177 Conn. 456, 460–61, 418 A.2d 899 (1979); accord *King* v. *Sultar*, 253 Conn. 429, 442, 754 A.2d 782 (2000); *Maciejewski* v. *West Hartford*, 194 Conn. 139, 144, 146, 480 A.2d 519 (1984).

A municipal firefighter or police officer eligible for heart and hypertension benefits "is not required to prove that the [hypertension or] heart disease is causally connected to [his or her] employment . . . ." (Internal quotation marks omitted.) *Ciarlelli* v. *Hamden*, 299 Conn. 265, 276, 8 A.3d 1093 (2010). "The plain

language of § 7-433c demonstrates that a uniformed member of a paid municipal fire department or a regular member of a paid municipal police department [whose employment began prior to July 1, 1996] is entitled to benefits under the statute when the officer meets the following requirements: (1) [the officer] has passed a preemployment physical; (2) the preemployment physical failed to reveal any evidence of hypertension or heart disease; (3) [the officer] suffers either off duty or on duty any condition or impairment of health; (4) the condition or impairment of health was caused by hypertension or heart disease; and (5) the condition or impairment results in his death or his temporary or permanent, total or partial disability. *The statute contains no other requirements to qualify for its benefits*." (Emphasis added.) *Holston* v. *New Haven Police Dept.*, 323 Conn. 607, 616–17, 149 A.3d 165 (2016).

The majority accurately and frankly acknowledges the remedial character of § 7-433c. See footnote 11 of the majority opinion and accompanying text. Indeed, this characteristic has never been in doubt, and it is the reason that case after case decided by this court has observed that the statute "should be broadly construed in favor of disabled employees." (Internal quotation marks omitted.) *Coughlin* v. *Stamford Fire Dept.*, 334 Conn. 857, 863, 224 A.3d 1161 (2020). We also have said that any limitation on the right of recovery must be interpreted narrowly so as "not [to] impose greater constraints on the benefits afforded to disabled police officers and firefighters than the legislature has chosen to adopt." *Szudora* v. *Fairfield*, 214 Conn. 552, 559, 573 A.2d 1 (1990); see *Costello* v. *Fairfield*, 214 Conn. 189, 194, 571 A.2d 93 (1990) ("[b]ecause the Heart and Hypertension Act is remedial legislation, we should not ourselves enlarge [on] the limitations it imposes on recovery").

The foregoing cases are merely representative. As I previously mentioned, entitlement to heart and hypertension benefits has been an area of frequent litigation over the past seventy years. This fact is itself noteworthy because it places the defendant's proposed construction of the statute in historical perspective. Heart and hypertension benefits have been very costly to municipalities over the years, so much so that the legislature adopted a sunset provision putting an eventual end to them,[4] and municipalities always have had a strong financial incentive to seek to avoid paying these benefits by advancing every plausible argument, including an argument that the statutory language in § 7-433c is limited by the definitional terms in § 7-425. Yet, until now, there never has been any doubt that the benefits conferred by § 7-433c are available to all uniformed firefighters and regular police officers hired before July 1, 1996, regardless of whether the employing municipality chooses to participate in CMERS or the employee works part-time.[5] Indeed, these benefits historically

have been awarded to firefighters and police officers who clearly were *not* members of CMERS. See, e.g., *Lambert* v. *Bridgeport*, supra, 204 Conn. 566, 571 (upholding award under § 7-433c to police officer who was beneficiary of pension plan established pursuant to pension agreement "*not* promulgated under [CMERS]" (emphasis added)).

There is no statute of limitations barring originality in statutory construction, and it may be possible that the plain meaning of § 7-433c has been hiding in plain sight for the past seventy years. But the sheer novelty of the defendant's claim, particularly against a background of settled expectations, suggests to me that we should approach its legal theory with great caution.

II

SECTION 1-2z ANALYSIS OF THE TEXT
AND STATUTORY CONTEXT OF
§§ 7-425 (5) AND 7-433c

The defendant claims that the right to recover heart and hypertension benefits under § 7-433c is limited by the definition of "member" in § 7-425 (5). The sole basis for this claim is that § 7-433c is codified in the same part of the General Statutes as § 7-425, which provides in relevant part that "[t]he following words and phrases as used in this part, except as otherwise provided, shall have the following meanings . . . ." Although the plain language of § 7-425 provides that it shall apply to all "words and phrases as used in this part," the principles of statutory construction codified in § 1-2z instruct that we must examine the entire text of the relevant statutes, their relationship to other statutes and, if necessary, the potential absurdity and unworkability of the proffered construction. These steps are not suspended because one of the statutes under review contains a statutorily defined term, especially one that applies "except as otherwise provided . . . ." General Statutes § 7-425.

As a matter of fact, this court has declined to apply statutory definitions on multiple occasions after conducting the appropriate § 1-2z analysis. As we have observed, when the applicability of a statutory definition is at issue, "[t]he [threshold] question . . . is *whether* the statutory definition applies in the first instance." (Emphasis added.) *Commissioner of Environmental Protection* v. *Mellon*, 286 Conn. 687, 693 n.7, 945 A.2d 464 (2008). To resolve this question, we must consider the statutory definition within the context of the statutory scheme as a whole and the purpose it was designed to serve to determine whether its application is plausible, logical, rational, or will yield absurd and unworkable results. See, e.g., *Cohen* v. *Rossi*, 346 Conn. 642, 665–67,    A.3d    (2023) (declining to apply statutory definition of "municipal clerk" when textual and contextual considerations, including impracticality of literal definition, indicated that different meaning

was intended); *418 Meadow Street Associates, LLC* v. *Clean Air Partners, LLC,* 304 Conn. 820, 831 n.11, 43 A.3d 607 (2012) (concluding that statutory definition of term " 'interest' . . . quite simply [did not apply] because such an application would be nonsensical"); *Commissioner of Environmental Protection* v. *Mellon,* supra, 691, 693–95 (concluding that statutory definition of term "person" did not apply to statute in same chapter because application would create redundancy in text and contravene statute's broader purpose and legislative intent); *DaimlerChrysler Services North America, LLC* v. *Commissioner of Revenue Services*, 274 Conn. 196, 205–209, 875 A.2d 28 (2005) (concluding that statutory definition of term "retailer" did not apply to tax credit under statutory scheme); *State* v. *Stephenson*, 207 Conn. App. 154, 181–84, 263 A.3d 101 (2021) (concluding that statutory definition of term "physical evidence" did not apply to crime of tampering or fabricating physical evidence), cert. denied, 342 Conn. 912, 272 A.3d 198 (2022).

In the present case, a proper § 1-2z analysis raises serious doubts about whether the definition of "member" in § 7-425 (5) was intended to apply to § 7-433c. The definitions in § 7-425 are part of the statutory framework governing the administration of CMERS. See *Maturo* v. *State Employees Retirement Commission*, 326 Conn. 160, 172, 162 A.3d 706 (2017). Subdivision (5) of the statute manifestly serves that purpose. It begins by designating a general category of "regular employee[s] or elective officer[s]" who qualify as "member[s]" under CMERS and then excludes certain subsets of those persons from the scope of that definition. General Statutes § 7-425 (5). Under § 7-425 (5), a "member" means, in relevant part, "any regular employee or elective officer *receiving pay from a participating municipality . . . who has been included by such municipality in the pension plan as provided in section 7-427, but shall not include any person who customarily works less than twenty hours a week if such person entered employment after September 30, 1969 . . . .* " (Emphasis added.)

The meaning of this definition, in my view, is clear. To be a "member," a municipal employee or elective officer must be paid by a "participating municipality." A "participating municipality" is defined in § 7-425 (2) as "any municipality that has accepted this part, as provided in section 7-427 . . . ." Section 7-427, in turn, is the provision at the center of the statutory scheme establishing CMERS; it permits a municipality to opt into CMERS and to designate which of its departments will participate in the retirement fund.[6] Some of the largest municipalities in Connecticut (New Haven and Waterbury, for example) do not participate in CMERS. Other municipalities, such as Hartford and Stamford, participate as to certain of their municipal employees but do not include their fire or police personnel in the

fund.[7] As the Appellate Court correctly concluded on the basis of this statutory scheme, the threshold requirement for any municipal employee to fall within the definition of "member" in § 7-425 (5) is employment by a municipality that participates in CMERS. See *Clark* v. *Waterford, Cohanzie Fire Dept.*, 206 Conn. App. 223, 241, 261 A.3d 97 (2021) ("[a]s a result [of the statutory definitions in § 7-425], and significantly for purposes of our analysis, a *member* within the meaning of [§ 7-425 (2) and (5)] refers only to those regular employees or elective officers who receive pay from a municipality that participates in the retirement fund" (emphasis in original)).

The majority appears to conclude that the relevant portion of the single sentence definition of "member" in § 7-425 (5) can be separated into two independent parts. It proposes that the first clause, which defines "member[s]" as employees of municipalities that participate in CMERS, does not apply to § 7-433c because it conflicts with the portions of § 7-433c that indicate that heart and hypertension benefits are available to municipal firefighters and police officers regardless of the retirement program "under which [the employee] is covered . . . ." General Statutes § 7-433c (a). It then concludes that the second clause of § 7-425 (5), which excludes from the definition of "member" those persons who work less than twenty hours per week, can function independently of the threshold criterion in the first clause, which requires CMERS participation. The majority posits that the second clause, operating independently, excludes part-time, *non*-CMERS firefighters and police officers from receiving § 7-433c heart and hypertension benefits.

These two clauses cannot be disaggregated in the manner suggested by the majority. The exclusion contained in the second clause is not independent and freestanding but, rather, operates to limit the general category of persons designated in the first clause; a "member" is a person who is paid by a participating municipality—a participant in CMERS—who customarily works twenty hours or more per week. The majority's contrary view violates basic principles of statutory construction by splitting a unitary definition into two separate parts, discarding the core part of the definition and retaining only the exception. See *Stratford Police Dept.* v. *Board of Firearms Permit Examiners*, 343 Conn. 62, 79, 272 A.3d 639 (2022) (rejecting plaintiff's reliance on latter part of statutory definition at expense of first part of definition and considering entire definition in statutory analysis); *Wiseman* v. *Armstrong*, 269 Conn. 802, 810, 850 A.2d 114 (2004) ("[a] statute is enacted as a whole and must be read as a whole rather than as separate parts or sections").

In support of its construction, the majority contends that "§ 7-425 (5) uses punctuation to phrase separately

its exclusion of 'any person who customarily works less than twenty hours a week if such person entered employment after September 30, 1969,' from its description of a 'member' as one who 'receiv[es] pay from a participating municipality . . . .'" I cannot deny that the definition contains two clauses and uses punctuation (a comma), but the *meaning* of those constituent parts is what matters, and it is clear to me from the syntax that the two clauses work together and are not severable. See *United States National Bank of Oregon* v. *Independent Ins. Agents of America, Inc.*, 508 U.S. 439, 454–55, 113 S. Ct. 2173, 124 L. Ed. 2d 402 (1993) ("[A] purported [plain meaning] analysis based only on punctuation is necessarily incomplete and runs the risk of distorting a statute's true meaning. . . . Over and over we have stressed that [i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy. . . . No more than isolated words or sentences is punctuation alone a reliable guide for discovery of a statute's meaning. Statutory construction is a holistic endeavor . . . and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter." (Citations omitted; internal quotation marks omitted.)). Construing the definition of "member" in § 7-425 (5) as a whole—as we must—results in the logical and inevitable conclusion that, if the definition applies to § 7-433c, then heart and hypertension benefits are available only to those firefighters and police officers who are employed by a municipality that participates in CMERS *and* who customarily work twenty hours or more per week.

With the unitary nature of this definition in mind, I believe that the majority concedes the match when it acknowledges that "the language of § 7-433c is—at best—ambiguous with respect to the issue of whether a firefighter or police officer must be employed by a 'participating municipality,' given the ample references in § 7-433c to the retirement system under which the employee is covered, which is broader in concept than a simple reference to the [CMERS] retirement fund." The majority, in other words, agrees that the text of § 7-433c demonstrates that heart and hypertension benefits are *not* limited to CMERS members. Because the definition of "member" includes only CMERS participants, the majority's own analysis of § 7-433c compels the conclusion that the statutory scheme is "at best" ambiguous as to whether the definition of "member" in § 7-425 (5) was intended to apply to § 7-433c at all.

I agree with the majority that the statutory scheme, taken as a whole, is at the very least ambiguous as to whether a firefighter or police officer claiming heart and hypertension benefits must be employed by a municipality that participates in CMERS. Extensive textual evidence indicates that heart and hypertension bene-

fits were intended to be available to all eligible firefighters and police officers, regardless of the retirement system under which they are covered. The sheer volume of this evidence demonstrates why we should be extremely skeptical that the legislature ever intended the definition of "member" in § 7-425 (5) to govern health and hypertension benefits under § 7-433c.

Section 7-433c (a) provides that the eligible employee "shall receive from his municipal employer compensation and medical care in the same amount and the same manner as that provided under chapter 568 . . . *from the municipal or state retirement system under which he is covered* . . . . The benefits provided by this section shall be in lieu of any other benefits which such policeman or fireman or his dependents may be entitled to receive from his municipal employer under the provisions of chapter 568 *or the municipal or state retirement system under which he is covered* . . . ." (Emphasis added.) I agree with the majority that these ample references to "municipal or state retirement system" strongly suggest that the legislature did not intend for heart and hypertension benefits under § 7-433c to be restricted solely to those firefighters and police officers employed by a "participating municipality."

The majority also observes, and I further agree, that "the independent definition in § 7-433c (a) of the term 'municipal employer' by reference to [General Statutes] § 7-467, as the entity liable to pay the benefits, is itself broader than 'participating municipality.' " See General Statutes § 7-467 (1) (defining "municipal employer" as "*any political subdivision of the state, including any town, city, borough, district, district department of health, school board, housing authority or other authority established by law*, a private nonprofit corporation which has a valid contract with any town, city, borough or district to extinguish fires and to protect its inhabitants from loss by fire, and any person or persons designated by the municipal employer to act in its interest in dealing with municipal employees" (emphasis added)).[8]

There is additional evidence of ambiguity, both in the text of § 7-433c and in other parts of the broader statutory scheme, that raises still more doubt as to whether the definition of "member" in § 7-425 (5) was intended to apply to the terms "uniformed member" and "regular member" in § 7-433c. Section 7-433c, for its part, begins with a robust and unqualified declaration of exclusive dominion over the subject of heart and hypertension benefits: "[n]otwithstanding any provision of chapter 568 *or any other general statute*, charter, special act or ordinance to the contrary . . . ." (Emphasis added.) General Statutes § 7-433c (a). This broad, preemptive language reasonably could be understood to reflect a legislative intention that heart and hypertension benefits should be made available free from *any*

statutory limitation that might otherwise apply. See *Velez* v. *Commissioner of Correction*, 250 Conn. 536, 544, 738 A.2d 604 (1999) ("the phrase '[n]otwithstanding any other provision of the [G]eneral [S]tatutes' " overrides contrary statutory provisions (emphasis omitted)); cf. *National Labor Relations Board* v. *SW General, Inc.*, 580 U.S. 288, 302, 137 S. Ct. 929, 197 L. Ed. 2d 263 (2017) ("[a] 'notwithstanding' clause [in a statute] . . . shows which of two or more provisions prevails in the event of a conflict"); *Cisneros* v. *Alpine Ridge Group*, 508 U.S. 10, 18, 113 S. Ct. 1898, 123 L. Ed. 2d 572 (1993) ("As [the court has] noted previously in construing statutes, the use of . . . a 'notwithstanding' clause . . . override[s] conflicting provisions of any other section. . . . [A] clearer statement [of legislative intent] is difficult to imagine." (Citation omitted; internal quotation marks omitted.)).

Ambiguity in the broader statutory scheme is also apparent when § 7-433c is viewed in relation to other statutes relating to heart and hypertension benefits. General Statutes § 5-145a provides heart and hypertension benefits to certain state employees, including "member[s] of the security force or fire department of The University of Connecticut" and "member[s] of the Office of State Capitol Police . . . ." Section 5-145a is not codified in the same part of the General Statutes as § 7-425, and, therefore, the term "member" in the former statute is not restricted by the definition in § 7-425 (5). It would be anomalous for the legislature to provide heart and hypertension benefits to state firefighters and police officers regardless of their part-time status, but to restrict the same benefits for municipal firefighters and police officers on that basis. See, e.g., *LaFrance* v. *Lodmell*, 322 Conn. 828, 838, 144 A.3d 373 (2016) (reading statutes on same subject matter in different part of statutory scheme harmoniously "to ensure the coherency of our construction" (internal quotation marks omitted)). Likewise, volunteer municipal firefighters are entitled to heart and hypertension benefits under General Statutes § 7-314a, regardless of the municipality's participation in CMERS and the number of hours customarily worked per week.[9] I can perceive no reason why the legislature would choose to extend these benefits to part-time, volunteer firefighters, but not to part-time firefighters and police officers who are paid for their services.

Lastly, and importantly, our case law indicates that the ambiguity analysis under § 1-2z also requires consideration of whether a proposed interpretation is plausible as a matter of common sense within the statute's intended sphere of operation, which, in this case is the provision of heart and hypertension benefits to municipal firefighters and police officers in Connecticut. The traditional principles of statutory construction codified in § 1-2z do not permit us to substitute our own policy preferences for those expressed by the legislature, but

we do not ignore practical and commonsensical considerations when we assess the plausibility of competing interpretations. See *Cohen* v. *Rossi*, supra, 346 Conn. 665–67 (concluding that statutory text was unambiguous in light of practical factors involving operation of municipal clerk's office); *Seramonte Associates, LLC* v. *Hamden*, 345 Conn. 76, 91, 282 A.3d 1253 (2022) (rejecting proposed construction of "the word 'submit' " in part because of practical considerations regarding incentive of taxpayers to ensure "that municipal assessors obtain necessary information in a timely fashion"); *Casey* v. *Lamont*, 338 Conn. 479, 493, 258 A.3d 647 (2021) (considering commonsense implications of statutory construction before resorting to extratextual sources to glean legislature's intent); *Board of Education* v. *State Board of Education*, 278 Conn. 326, 337, 898 A.2d 170 (2006) ("[i]n construing a statute, common sense must be used and courts must assume that a reasonable and rational result was intended" (internal quotation marks omitted)).

The majority appears to conclude, as did the Appellate Court, that it defies common sense to construe these statutes to limit heart and hypertension benefits to firefighters and police officers employed by municipalities that participate in CMERS. See *Clark* v. *Waterford, Cohanzie Fire Dept.*, supra, 206 Conn. App. 242. I cannot think of a reason why the legislature would limit heart and hypertension benefits in such a manner, and neither the majority nor the defendant has offered any reason that would explain such a seemingly arbitrary result. The absence of any such explanation is especially troubling in light of the remedial purpose of § 7-433c and the real-world consequences of the majority's holding. The majority's restrictive construction of § 7-425 (5) may prove especially harmful to those firefighters and police officers, hired before July 1, 1996, who have planned their affairs in reasonable reliance on the availability of these important benefits. For example, individuals typically make decisions about the need to purchase life, health or disability insurance and make similar, forward-looking plans in light of the employment benefits that they reasonably believe they already possess. It seems highly unlikely that the firefighters and police officers affected by today's decision—those hired prior to July 1, 1996—will be able to obtain affordable, substitute protection for the lost benefits at this point in their lives. As a result of the majority's decision, the payment of heart and hypertension benefits to future claimants employed by nonparticipating municipalities is thrown into doubt, and there may even be serious question regarding the continuation of past awards payable in the future to non-CMERS firefighters, police officers, and their survivors.[10]

### III

### EXTRATEXTUAL EVIDENCE OF

## LEGISLATIVE INTENT

A thorough review of the history, purpose, and legislative intent animating § 7-433c leads me to conclude that the terms "uniformed member" and "regular member" do not incorporate the definition of "member" in § 7-425 (5) but, instead, must be accorded their natural and ordinary meanings without reference to the latter statute. See General Statutes § 1-1 (a) ("[i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language"). There is simply nothing in the legislative history to suggest any intention to restrict the availability of heart and hypertension benefits to firefighters and police officers employed by a limited class of municipalities. To the contrary, the benefits clearly were intended for all eligible firefighters and police officers, regardless of whether they are employed by a municipality that participates in CMERS or work less than twenty hours per week.

As I previously explained, the purpose of § 7-433c was to confer heart and hypertension benefits on municipal firefighters and police officers who meet the statutory requirements set forth in § 7-433c, regardless of whether the heart condition or hypertension was caused by, or even related to, the municipal firefighter's or police officer's employment. The first version of the heart and hypertension benefits statute was enacted in 1951 and originally provided these benefits to "uniformed member[s]" of "paid fire department[s] . . . ."[11] Public Acts 1951, No. 220. The legislative history from 1951 is relatively sparse as it pertains specifically to the word "member," but it is evident that heart and hypertension benefits were intended to apply to all municipalities across the state and that "member" took on a plain meaning. See, e.g., Proposed Senate Bill No. 736, 1951 Sess. ("STATEMENT OF PURPOSE: [t]he purpose of this act is to provide for firemen whose health is impaired by hypertension or heart disease while *members of any city fire department*" (emphasis added)).[12]

The version of the bill that was ultimately enacted in 1951 by the legislature used language that broadly provided that, "[n]otwithstanding the provisions of any general statute or special act to the contrary affecting the noncontributory or contributory retirement systems of *any municipality of the state* as defined by section 680 of the general statutes, any condition of impairment of health caused by hypertension or heart disease resulting in total or partial disability to a uniformed *member* of a paid fire department of *such municipality* who successfully passed a physical examination on entry into such service, which examination failed to reveal any evidence of such condition, shall be presumed to have been suffered in line of duty." (Emphasis added.) Public Acts 1951, No. 220. General Statutes (1949 Rev.) § 680 defined "municipality" in relevant part as "each

town, consolidated town and city, consolidated town and borough, city, [or] borough . . . upon which is placed by law the duty of, or which has itself assumed the duty of, protecting its inhabitants from loss of fire. . . .” As the statute was amended to include police and to strengthen the presumption that these conditions were sustained in the line of duty, this expansive language carried through.[13]

In 1971, when the statute was renumbered § 7-433c, the language changed slightly from these earlier versions, but, as is still the case today, the statute incorporated the broad definition of “municipal employer” from § 7-467 in its scheme and the broad phrase “municipal or state retirement system under which he is covered” when discussing the administration of benefits. See Public Acts 1971, No. 524, § 1.[14] The legislature in 1971 also discussed the purpose behind the provision of heart and hypertension benefits: to address “the unusual risk attendant to police and fire work and to provide these benefits for the men who risk their lives for us each and every day.” 14 H.R. Proc., Pt. 8, 1971 Sess., p. 3525, remarks of Representative Gerald F. Stevens; see 14 S. Proc., Pt. 6, 1971 Sess., p. 2804, remarks of Senator Wilber G. Smith (“[W]e’re always talking about the hazardous conditions of our policemen and our firemen. [We’re] always talking about pouring in more moneys for them to do a better job and to be more effective. . . . [W]e also have to recognize that we’re also adding and egging them on really, to move into and take care of these hazardous positions. . . . [I]t ought to be recognized that . . . throughout their careers, [these] policemen and firemen are indeed confronted more seriously with hazardous conditions. And I move for passage of . . . a vital piece of legislation, in support of our local police and our local fire departments.”).[15]

The legislature again took up the subject in the 1990s and eventually restricted the benefits to make them unavailable to firefighters and police officers employed on or after July 1, 1996; see Public Acts 1996, No. 96-231, § 2; it continued to express the importance of giving the benefits to firefighters and police officers across the state. See, e.g., 35 H.R. Proc., Pt. 5, 1992 Sess., p. 1675, remarks of Representative Joseph A. Adamo (“Connecticut’s [h]eart and [h]ypertension [l]aws . . . pertain to firefighters and police officers who serve in our municipalities in the [s]tate of Connecticut” (internal quotation marks omitted)); id., pp. 1700–1701, remarks of Representative Dale W. Radcliffe (“[e]very individual who is subject to the special benefit of [§] 7-433c today, will remain subject to the special benefits . . . for the balance of the time that that individual is *employed by a police department or by a municipal fire department in the [s]tate of Connecticut*” (emphasis added)); see also, e.g., 39 S. Proc., Pt. 8, 1996 Sess., p. 2570, remarks of Senator Louis C. DeLuca (“[t]his is the so-called grandfather bill on heart and hypertension

whereby all new hires [on or] after July 1, 1996 would not be under the heart and hypertension law, but all those now currently employed as *paid firemen, police in the [s]tate of Connecticut in municipal departments*, would still be under the heart and hypertension law" (emphasis added)).

The foregoing legislative history reflects that the legislature's purpose behind the statute has always been expansive and remedial, and the available evidence indicates that the benefits were intended to extend to firefighters and police officers in all municipalities. There is no suggestion anywhere in the legislative history that the legislature intended to limit the benefits only to firefighters and police officers employed by municipalities that participate in CMERS. It is implausible and unrealistic to believe that the legislature would enact such an important (not to mention seemingly arbitrary and inexplicable) restriction without so much as a mention anywhere in the legislative materials spanning decades. See *King* v. *Sultar*, supra, 253 Conn. 442–43 (giving weight to silence in legislative history when determining whether city employer could intervene in case involving § 7-433c benefits).

Heart and hypertension benefits have been around since 1951, and there has been extensive debate within the General Assembly since then as to the many aspects of the statutory scheme. The history reflects significant discussion among supporters and dissenters alike from major cities across Connecticut, including those not participating in CMERS, such as Bridgeport and New Haven, about exactly how costly these benefits are to municipalities for eligible firefighters and police officers. See 35 H.R. Proc., supra, pp. 1688–89, remarks of Representative Radcliffe ("[W]e have to look very hard at what this special benefit has cost to our municipalities. . . . We're talking in [f]iscal [y]ear[s] 1989, and 1990, for example, in the [c]ity of Bridgeport, combined benefits [were] $1,700,000. New Haven, $1,100,000. West Haven, a distressed municipality, $204,000. And these numbers . . . represent [a] cost to each and every municipal taxpayer in the [s]tate of Connecticut."); Conn. Joint Standing Committee Hearings, Labor and Public Employees, Pt. 3, 1996 Sess., p. 824, testimony of Dennis Murphy, chief administrative officer of the city of Bridgeport ("I would like to say in . . . Bridgeport . . . heart and hypertension [benefits are] a burden that we continue to bear. . . . I would just, on behalf of those taxpayers, request this body to find the extraordinary responsibility to fund this benefit should you choose to continue it.").

Notwithstanding this extensive historical record documenting the numerous occasions of legislative consideration and reconsideration of the statutory scheme over many years, not a single person once said or suggested that these benefits are available only to some

firefighters and police officers, namely, those employed by municipalities participating in CMERS or those who work a certain number of hours per week. There is not even a single reference, anywhere in the legislative history, to the definition of "member" in § 7-425 (5). In my estimation, it is virtually inconceivable that the legislature would enact a law of this prominence without any reference whatsoever to a fundamental feature that so dramatically affects its scope.

In sum, the text and context of the relevant statutes, the broad remedial purpose of § 7-433c, and the legislative history convince me that the definition of "member" in § 7-425 (5) does not apply to the heart and hypertension statute. The terms "uniformed member" and "regular member" in § 7-433c instead mean what everyone has understood them to mean for the past seventy years, and do not restrict the availability of heart and hypertension benefits to firefighters and police officers paid by municipalities that participate in CMERS or to those who customarily work twenty hours or more per week. See *Board of Education* v. *State Board of Labor Relations*, 217 Conn. 110, 126–27, 584 A.2d 1172 (1991) ("[a] statute . . . should not be interpreted to thwart its purpose" (internal quotation marks omitted)). There is no indication in the statutory scheme that the legislature intended to limit heart and hypertension benefits to "member[s]," as defined by § 7-425 (5), and "[this court] should not [itself] enlarge [on] the limitations [§ 7-433c] imposes on recovery." *Costello* v. *Fairfield*, supra, 214 Conn. 194.

Accordingly, I respectfully dissent.

[1] General Statutes § 7-433c provides: "(a) Notwithstanding any provision of chapter 568 or any other general statute, charter, special act or ordinance to the contrary, in the event a uniformed member of a paid municipal fire department or a regular member of a paid municipal police department who successfully passed a physical examination on entry into such service, which examination failed to reveal any evidence of hypertension or heart disease, suffers either off duty or on duty any condition or impairment of health caused by hypertension or heart disease resulting in his death or his temporary or permanent, total or partial disability, he or his dependents, as the case may be, shall receive from his municipal employer compensation and medical care in the same amount and the same manner as that provided under chapter 568 if such death or disability was caused by a personal injury which arose out of and in the course of his employment and was suffered in the line of duty and within the scope of his employment, and from the municipal or state retirement system under which he is covered, he or his dependents, as the case may be, shall receive the same retirement or survivor benefits which would be paid under said system if such death or disability was caused by a personal injury which arose out of and in the course of his employment, and was suffered in the line of duty and within the scope of his employment. If successful passage of such a physical examination was, at the time of his employment, required as a condition for such employment, no proof or record of such examination shall be required as evidence in the maintenance of a claim under this section or under such municipal or state retirement systems. The benefits provided by this section shall be in lieu of any other benefits which such policeman or fireman or his dependents may be entitled to receive from his municipal employer under the provisions of chapter 568 or the municipal or state retirement system under which he is covered, except as provided by this section, as a result of any condition or impairment of health caused by hypertension or heart disease resulting in his death or his temporary or permanent, total or partial disability. As used in this section, 'municipal employer' has the same meaning as provided in section 7-467.

"(b) Notwithstanding the provisions of subsection (a) of this section,

those persons who began employment on or after July 1, 1996, shall not be eligible for any benefits pursuant to this section."

[2] General Statutes § 7-425 provides in relevant part: "The following words and phrases as used in this part, except as otherwise provided, shall have the following meanings:

* * *

"(5) 'Member' means any regular employee or elective officer receiving pay from a participating municipality, and any regular employee of a free public library that receives part or all of its income from municipal appropriation, who has been included by such municipality in the pension plan as provided in section 7-427, but shall not include any person who customarily works less than twenty hours a week if such person entered employment after September 30, 1969, any police officer or firefighter who will attain the compulsory retirement age after less than five years of continuous service in fund B, any teacher who is eligible for membership in the state teachers retirement system, any person eligible for membership in any pension system established by or under the authority of any special act or of a charter adopted under the provisions of chapter 99, or any person holding a position funded in whole or in part by the federal government as part of any public service employment program, on-the-job training program or work experience program, provided persons holding such federally funded positions on July 1, 1978, shall not be excluded from membership but may elect to receive a refund of their accumulated contributions without interest . . . ."

[3] The defendant Connecticut Interlocal Risk Management Agency is not a party to this appeal. See footnote 2 of the majority opinion. All references in this opinion to the defendant are to the town of Waterford, Cohanzie Fire Department.

[4] See Public Acts 1996, No. 96-231, §§ 1 and 2 (amending subsection (b) of § 7-433c to provide that municipal firefighters and police officers whose employment began on or after July 1, 1996, are ineligible for heart and hypertension benefits); see also 39 S. Proc., Pt. 8, 1996 Sess., p. 2571, remarks of Senator Louis C. DeLuca ("This [amendment] would bring some sort of relief to the municipalities. We've talked about state mandates and unfunded state mandates. This is one of those that has been consistently a problem [for] many of the major cities.").

[5] To be sure, there have been skirmishes over eligibility for heart and hypertension benefits around the margins. See, e.g., *Holston* v. *New Haven Police Dept.*, supra, 323 Conn. 614, 616–17 (police officer was eligible for benefits after passing preemployment physical and suffering from disability caused by heart disease); *Genesky* v. *East Lyme*, 275 Conn. 246, 253–59, 881 A.2d 114 (2005) (constable was not regular member of paid municipal police department); *Bucko* v. *New London*, 13 Conn. App. 566, 569–71, 537 A.2d 1045 (1988) (temporary appointee to police force was regular member of paid municipal police department). I consider it notable that our courts never have looked to § 7-425 (5) for assistance in determining who is eligible to receive these benefits under § 7-433c.

[6] General Statutes § 7-427 (a) provides in relevant part: "Any municipality except a housing authority, which is governed by subsection (b) of this section or a regional workforce development board established under section 31-3k, which is governed by section 7-427a, *may, by resolution passed by its legislative body and subject to such referendum as may be hereinafter provided, accept this part as to any department or departments of such municipality as may be designated therein,* including elective officers if so specified, free public libraries which receive part or all of their income from municipal appropriation, and the redevelopment agency of such municipality whether or not such municipality is a member of the system, as defined in section 7-452, but such acceptance shall not repeal, amend or replace, or affect the continuance of, any pension system established in such municipality by or under the authority of any special act and all such special acts shall remain in full force and effect until repealed or amended by the General Assembly or as provided by chapter 99. . . ." (Emphasis added.)

[7] See Office of the State Comptroller, Retiree Resources, "Who Is in CMERS? Participating Municipalities," available at https://www.osc.ct.gov/rbsd/cmers/plandoc/MasterTownListSept132016.pdf (last visited June 14, 2023).

[8] The majority concludes that, by expressly providing that the term "municipal employer," as used in § 7-433c, has a particular meaning defined in § 7-467, the legislature demonstrated that the word "member" must have the meaning ascribed to it in § 7-425 (5) because, otherwise, a different definition likewise would have been provided in § 7-433c. I would conclude instead

that, having defined "municipal employer" to clarify that *all* municipalities are obligated to pay heart and hypertension benefits, there was no need to provide additional definitions regarding which firefighters and police officers are entitled to receive those benefits. In other words, because all municipalities cannot mean only "participating municipalities," the terms "uniformed members" and "regular members" cannot mean only those "member[s]," as that term is defined in § 7-425 (5). The statutory scheme is ambiguous because, as the Appellate Court correctly pointed out, the broad definition of "municipal employer" in § 7-467 indicates that heart and hypertension benefits are available under § 7-433c to *all* "uniformed firefighters and regular police officers who are paid by municipalities that do not participate in [CMERS]." *Clark* v. *Waterford*, *Cohanzie Fire Dept.*, supra, 206 Conn. App. 242.

[9] See General Statutes § 7-314a (d) (conferring heart and hypertension benefits on "an active member of a volunteer fire department or organization certified as a volunteer ambulance service in accordance with section 19a-180 while such member is in training for or engaged in volunteer fire duty or such ambulance service").

[10] At least one court has concluded that heart and hypertension benefits are protected by the due process clause of the fourteenth amendment. See *Smith* v. *East Lyme*, Docket No. 527383, 1994 WL 133379, *5 (Conn. Super. April 5, 1994) (§ 7-433c benefits are identifiable property right for cause of action pursuant to 42 U.S.C. § 1983). The question is not presented in this case, and I express no opinion on its merits.

[11] The definition of "member" in § 7-425 (5) was codified in that same chapter in 1945 and originally provided that " 'member' shall mean any regular employee or elective officer receiving pay from a participating municipality who has been included by such municipality in the pension plan as provided in section 122h . . . ." General Statutes (Supp. 1945) § 121h. The definition did not contain a limit as to the number of hours until 1969. See Public Acts 1969, No. 408.

[12] This proposed version of the bill contained the word "member" and began with the following language: "Notwithstanding the provisions of any general or special law to the contrary affecting the non-contributory or contributory retirement systems of any city of the state of Connecticut . . . ." Proposed Senate Bill No. 736, 1951 Sess.

[13] The 1961, 1967, and 1969 statutes all contained the following language: "For the purpose of the adjudication of claims for the payment of benefits under the provisions of chapter [568] of the general statutes and the contributory or non-contributory retirement systems of *any municipality* . . . ." (Emphasis added.) Public Acts 1961, No. 330, § 1; accord Public Acts 1969, No. 380, § 1; Public Acts 1967, No. 770, § 1. They defined " 'municipality' " as "*any town, city*, borough, fire district or other municipal corporation or taxing district *which provides police or fire protection to its inhabitants*." (Emphasis added.) Public Acts 1961, No. 330, § 1; accord Public Acts 1969, No. 380, § 1; Public Acts 1967, No. 770, § 1.

[14] The legislative history indicates that the reenactment came in response not to the meaning of "member" changing but, rather, to this court's striking down the conclusive presumption added in 1969 as unconstitutional in *Ducharme* v. *Putnam*, 161 Conn. 135, 143, 285 A.2d 318 (1971). See 14 S. Proc., Pt. 6, 1971 Sess., pp. 2803–2804, remarks of Senator Wilber G. Smith. The history indicates that § 7-433c was enacted to carry out the clear and consistent intent of the legislature as to the nature of these benefits. See id.

[15] Later, there was also discussion that these benefits were intended to place firefighters and police officers on equal footing with those seeking workers' compensation. See *King* v. *Sultar*, supra, 253 Conn. 442 ("[the] history of . . . the bill eventually enacted as P.A. 77-520, § 1, which amended § 7-433c, demonstrates that it was intended to place those policemen [or firemen] who die or are disabled as a result of heart disease or hypertension in the same position vis-à-vis compensation benefits as policemen [or firemen] who die or are disabled as a result of service related injuries" (internal quotation marks omitted)). I find this latter point significant because nowhere in the workers' compensation realm are the benefits to firefighters and police officers restricted only to those persons employed by municipalities that participate in CMERS or persons who work a minimum number of hours per week. See General Statutes § 31-275 (9) (A) (iv) ("employee," for purposes of Workers' Compensation Act, includes "[a] paid member of any police department or fire department").